FILED
OCT 15 2013
U.S. DISTRICT COURT-WVND
CLARKSBURG, WV 26301

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID NICOLE BENNETT (NICOLE BENNETT) THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK | Case No. 1:13MJ 125 |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, L. Mark Rogers, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.  I make this affidavit in support of an application for a search warrant, requested by Assistant United States Attorney Shawn Angus Morgan, for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook, a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2.  I am a Bridgeport (West Virginia) Police Department Police Officer with the rank of PFC/Detective assigned to the Greater Harrison County Drug and Violent Crimes Task Force (GHCDTF). I have been employed with the Bridgeport Police Department since August 1, 2005. As part of my daily duties with the GHCDTF, I investigate criminal violations relating to the unlawful distribution, possession with intent to distribute, and manufacture of controlled

substances, in violation of Title 21, United States Code, Section 801 *et seq.*, and related crimes, including violent crimes. I have received training in the area of investigating and prosecuting drug trafficking offenses, and have had the opportunity to observe the commission of drug offenses, particularly while working in an undercover capacity. I have also participated in the execution of approximately 20 search warrants, many of which involved drug trafficking or controlled substances manufacturing offenses.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1512(d)(4) and 1512(j) have been committed by Nicole Bennett [USER ID NICOLE BENNETT (Nicole Bennett)]. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

5. On August 3, 2013, I began to investigate Leroy Rousseau, Nicole Bennett's boyfriend, for possession with intent to distribute cocaine base. On the same date, Special Agent Kenneth Grace of the Bureau of Alcohol, Tobacco, Firearms & Explosives began to investigate Rousseau for being a convicted felon in possession of a firearm. Rousseau was found in possession of the cocaine base and a firearm at the time he was arrested on this date by Clarksburg (West Virginia) Police Department Patrolman Zack Lantz.

6. On the same date, S/A Grace and I interviewed Nicole Bennett at her residence in Clarksburg, Harrison County, West Virginia, concerning Rousseau's possession of this firearm, described as a Hi-Point pistol, Model JHP, .45 caliber, serial number X4231527. Bennett advised us that she had removed the firearm from her residence and had placed the firearm into her rental car on August 2, 2013, intending to pawn it. She indicated that she never followed through with the pawn, but that Rousseau would not have known she had placed the firearm into the car.

7. In contrast, recorded jail calls between Bennett and Rousseau reveal that Bennett's statements and representations to S/A Grace were materially false, in violation of Title 18, United States Code, Section 1001(a)(2). S/A Grace listened to these calls on October 8, 2013. In the first significant call, which took place on August 3, 2013 (the same date Bennett was interviewed), Bennett told Rousseau, "This is the story you need to stick with." "We got into a fight." "I kicked you out." At this point, Rousseau interrupted Bennett, saying, "Hold up, hold up." "Listen to what you are saying." "They record these conversations on the phone." Bennett responded by saying, "Oh yeah, they do alright, anyway."

8. In the second significant call, recorded on August 6, 2013 at 10:07, Bennett said, "They are going to wonder why the gun was on you." "What else do you do when you get in a car and find a fully loaded gun, that was left down between the seat?" Rousseau said, "The gun wasn't even loaded." Bennett said, "It wasn't?" Rousseau said, "No bullets at all." There was then a pause in the conversation. Bennett said, "So it was empty?" Rousseau responded, "Empty." There was another pause in the conversation. Rousseau said, "Do you feel me?" There was no response at first. Bennett then said, "They told me the gun was loaded." Rousseau

3

said, "No, it wasn't, not at all." Rousseau asked, "Where did you get the bullets from?" There was another pause. Bennett then said, "F*&%." There was another pause. Rousseau said, "F*&% what?" There was another pause. Rousseau went on to ask, "They asked you if the gun was loaded?" Bennett said, "Yeah." Rousseau said, "And you said yeah?" Bennett paused, then said, "I said I keep it loaded." "I grabbed it out of the cabinet, hid it from him, went to the car, shoved it down in there and I was like, I was just taking it to the pawn shop." Rousseau said, "You didn't know which clip was in the gun, so you can't say whether the gun was loaded or not." Their conversation continued.

9. During the third significant call, which took place on August 7, 2013 at 14:03, Bennett was upset and said to Rousseau, "I told you not to take that God damn gun out of the house every single time." Rousseau responded by telling her to "chill out." Rousseau then raised his voice and said, "Why are you saying that on this phone?" Bennett did not respond. Rousseau then yelled, "Why would you say that on this phone?" There was once again silence. Bennett was crying and her response was unintelligible. The conversation continued and Rousseau said he was not trying to yell at Bennett. Bennett calmed down and their conversation continued.

10. When Bennett purchased the firearm at issue on July 8, 2013 (just a few weeks before Rousseau was arrested after having been found in possession of it), Bennett completed an ATF Form 4473. On that form, Bennett listed two addresses: one was a post office box in Weston, West Virginia, the other was a street address in Clarksburg, West Virginia.

## PROBABLE CAUSE

11. During my investigation, I learned:

   a. On September 4, 2013, a federal Grand Jury returned an Indictment in *United States v. Leroy Rousseau a/k/a "Black"*, in case number 1:13CR73. Count Seven of that Indictment charged Rousseau with Employment and Use of Person Under 18 Years of Age in Drug Operations. Count Seven identified the person under 18 years of age as "Z.H.";

   b. On September 27, 2013, the United States made initial discovery disclosures to counsel for Rousseau, including a report of interview of Z.H.;

   c. On October 1, 2013, a federal Grand Jury returned a Superseding Indictment against Rousseau; this Superseding Indictment reiterated the charge set forth in Count Seven of the original Indictment;

   d. The Court arraigned Rousseau on the Superseding Indictment on October 10, 2013; Rousseau's girlfriend, Nicole Bennett, attended the hearing;

   e. On October 9, 2013, Nicole Bennett posted the following message on her Facebook page, using her mobile phone: "This is for h------- [name blocked to protect anonymity of Z.H.] or z-------- [name blocked to protect anonymity of Z.H.] I saw your snitchn a** statement and I promise you that everyone will see that s*** as soon as I post it and all of Clarksburg will know that what u really are! Blaque took ur pathetic a** in and fed you and took care of you and you

5

wanna write a page against him? You will get what you deserve im quite sure of it!";

    f.   The cellular telephone, which later was identified as a Samsung, model: SGH-R760, serial number: A0000040C9C7DBLG, is the subject of a separate request for a search warrant;

    g.   Bennett used the Samsung cellular telephone and Facebook to communicate about and to Z.H. to post the October 9, 2013 message;

12.    I have reviewed the Facebook page of "NICOLE BENNETT" (Nicole Bennett on Facebook), and I believe Nicole Bennett, who was arrested on October 11, 2013 and was charged with intentionally harassing Z.H., utilized her own Facebook page to do so;

    a.   Bennett's message on the NICOLE BENNETT Facebook page related directly to the pending prosecution of Leroy Rousseau;

    b.   The timing of Bennett's Facebook post very closely followed the government's discovery disclosure to Rousseau and his counsel, including information concerning Z.H.;

    c.   The preceding post on Bennett's Facebook "wall", also made on October 9, 2013, was a picture of Leroy Rousseau holding a child on his lap. That picture was captioned, "My handsome baby and his baby:)"

13.    Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish

accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

14. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail address(es), Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

15. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

16. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these

privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

17. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

18. Facebook has a Photos application, where users can upload an unlimited number of albums and photos. Another feature of the Photos application is the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, a user's "Photoprint" includes all photos uploaded by that user that have not been deleted, as well as all photos uploaded by any user that have that user tagged in them.

19. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on

the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

20. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

21. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

22. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

23. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

24. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

25. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which

are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

26.   Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

27.   In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

28.   Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

29.   Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

30. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

31. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

32. When I accessed Facebook and searched for "Nicole Bennett", her public user profile showed a Facebook User ID of NICOLE BENNETT (Nicole Bennett). Bennett's profile shows that she is a resident of Weston, West Virginia, corroborating investigative information about her identity and residency, and about her likely use of the Facebook User ID of NICOLE BENNETT (Nicole Bennett).

### INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

33. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.

Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

34. Based on the forgoing, I request that the Court issue the proposed search warrant.

35. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

36. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

~~Robert L. Talkington~~ MARK ROGERS
~~West Virginia State Police~~ BRIDGEPORT Police Dept.
~~Internet Crimes Against Children Task Force~~
GREATER HARRISON COUNTY DRUG TASK FORCE

Subscribed and sworn to before me on this __15__ day of ~~May~~ October 2013.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE

12